**Sol Neil CORBIN, as Trustee in Bankruptcy of Franklin New York Corporation, Plaintiff,**

**and**

**Connecticut General Life Insurance Company et al., Plaintiffs-Intervenors,**

**v.**

**FEDERAL RESERVE BANK OF NEW YORK, Federal Deposit Insurance Corporation, in its corporate capacity and as Receiver of Franklin National Bank, Defendants.**

**No. 77 Civ. 4896 (MP)**

United States District Court, S. D. New York.

Sept. 4, 1979.

Barrett, Smith, Schapiro, Simon & Armstrong, New York City, for plaintiff Sol Neil Corbin, as Trustee in Bankruptcy of Franklin New York Corp.

Cahill, Gordon & Reindel, New York City, for defendant Federal Reserve Bank of New York.

Debevoise, Plimpton, Lyons & Gates, New York City, for plaintiffs-intervenors.

Casey, Lane & Mittendorf, New York City, for defendant Federal Deposit Ins. Corp.

## DECISION AND OPINION

POLLACK, District Judge.

This suit, presented at a Bench trial, seeks a reduction in the interest payable to the defendant Federal Reserve Bank of New York (FRB–NY) on its agreement to forbear for three years the collection of a past due $1.7 billion secured indebtedness of Franklin National Bank. The agreement was made with defendant Federal Deposit Insurance Corporation (FDIC) on the latter's purchase of assets from the Receiver of Franklin National Bank (FNB) and FDIC's assumption as primary obligor of the FNB indebtedness. The forbearance agreement and assumption were made with FDIC in its corporate capacity. FNB had been declared insolvent at the close of business on October 8, 1974 and FDIC was named as its Receiver by the Comptroller of the Currency. Pursuant to statutory authorization as the Receiver, FDIC sold the assets of the closed bank here involved to FDIC in its corporate capacity for purposes of liquidation.[1]

The plaintiff is the Trustee in Bankruptcy of FNB's parent, viz., Franklin New York Corporation, which owns all the out-

---

1. Pre-trial motions in this case resulted in an Opinion filed herein on October 6, 1978 to which reference is made. 458 F.Supp. 143. Familiarity therewith will be assumed to avoid some repetition.

standing stock of FNB, except directors' qualifying shares, and also holds a claim against FNB as a creditor thereof for $136,000. On October 16, 1974 the parent holding company filed a petition in bankruptcy and plaintiff was appointed as Trustee in Bankruptcy. He purports to bring this suit as a creditor of the FNB receivership estate and derivatively on behalf of FDIC–Receiver. He asserts that FDIC, as Receiver, owed a fiduciary duty to the creditors and stockholders of FNB which it breached by permitting FDIC in its corporate capacity to agree to the interest rate provisions of the assumption agreement; that those rates were unfair and that FDIC as Receiver in permitting the same did not act in respect thereto as a prudent fiduciary with proper regard for the interests of the creditors and shareholders of FNB.

This action was commenced on October 6, 1977, nearly three years after the declaration of FNB's insolvency and the substantial execution of the transactions referred to above. Shortly prior to the trial, holders of FNB's Subordinated Capital Debentures which are subordinate to the principal of and interest upon all liabilities of FNB, were granted leave to intervene on the side of the plaintiff and to participate in the trial, with certain limitations.

The defendants have contested the Court's jurisdiction and at all events have denied liability on the merits.

It appears by the preponderance of the credible evidence and the circumstances and the reasonable inferences to be drawn therefrom that the interest rate arrangements which have been questioned were part of a global negotiation of a series of interdependent and complex matters that were negotiated at arm's length, were agreed to in the exercise of sound judgment by the Receiver and FDIC (corporate), were fair to the receivership estate and were not a breach of fiduciary duty and that FRB–NY did not act unfairly or overreach the Receiver. Accordingly, the complaint must fail.

## I.

### The Background

In 1974, FNB was the twentieth largest bank in the United States. It had 104 banking offices. Early in May, 1974, FNB publicly announced massive losses in foreign exchange transactions during the first quarter of 1974. These disclosures caused a withdrawal of credit and deposits which threatened to close FNB and to severely disrupt the banking industry and the national economy. FNB was forced to turn to the Federal Reserve discount window for emergency borrowings which were available to member banks. A few days before the announcement, FRB–NY offered FNB discount window assistance on a daily basis as needed "within the limits of the collateral that can be supplied."

Commencing on May 8, 1974, with a loan of $135 million, FRB–NY began to make such emergency window one-day secured loans to FNB in amounts which increased sharply after May 13 and continued to mount until October 7, 1974. These window loans were made to avoid a liquidity crisis at FNB and the threat of a bank run, panic in the banking industry and a disruption of the national economy. The immediate effect of these window loans was to permit FNB to repay its large daily and short-term borrowings of unsecured federal funds from other banks that were not renewed after May 13. By law, the advances by FRB–NY to FNB had to be and were secured by FNB assets.[2]

To the extent that FNB furnished collateral "eligible" for purchase or discount by the Reserve Banks, the window loans made by FRB–NY thereon carried interest at the rate of 8% per annum;[3] the balance of the window loans, representing the bulk of FNB's borrowings, were secured by collateral acceptable as "satisfactory" by the Reserve Banks and these by law carried interest at a rate not less than one-half of one

---

**2.** Sec. 10(b) Federal Reserve Act; 12 U.S.C. § 347b.

**3.** Sec. 13, id.; 12 U.S.C. § 347.

per-cent per annum higher than the highest discount rate in effect at the Reserve Bank making the loan (here made at 8½%).[4]

Beginning on September 27, 1974, the interest rate on FNB's emergency window one-day loans became 10% per annum pursuant to a newly promulgated regulation of the Board of Governors of the Federal Reserve System.[5]

On October 8, 1974, FNB's indebtedness to FRB–NY amounted to $1,723,472,054 (the "Indebtedness" hereafter) which bore contract interest at the then 10% rate and was secured to the satisfaction of FRB–NY by collateral of value in a face amount in excess of $2.28 billion. The Indebtedness as incurred was evidenced by a series of one-day FNB promissory notes maturing the next day. During the period of the loans the interest accruing on each one-day note made by FNB was added to the principal amount of the following day's note.

## II.

On October 8, 1974, at 3:00 PM, the Comptroller of the Currency declared FNB insolvent pursuant to 12 U.S.C. § 191 and, as required by 12 U.S.C. § 1821(c), promptly appointed FDIC as FNB's Receiver. FNB's assets were then thought to be worth about $4-billion. Prior thereto, at the instance of the Comptroller of the Currency, beginning in July 1974, FDIC had undertaken contingency planning to work out the solution for FNB and had conducted discussions with banking interests concerning the possibility of a take-over of FNB's assets and liabilities or at least a part of them by a purchase and assumption transaction. Coincident therewith, FDIC sought to evolve a three to five-year repayment program for any remaining Indebtedness to FRB–NY pursuant to which FDIC in its corporate capacity would assume that remaining Indebtedness and have time to pay it off from the liquidation of FNB's assets.

4. Sec. 10(b), id.; 12 U.S.C. § 347b.

5. 12 C.F.R. § 201.2(e)(2) (1978).

FRB–NY is not ordinarily a long-term lender; its window loans are normally of short duration; it functions to represent the public as a lender of last resort.[6] Federal Reserve Act, 12 U.S.C. § 221 *et seq.* However, the efforts of FDIC to reach a solution for FNB's predicament bore fruit in the following agreements of October 8, 1974 which were made after FNB was declared insolvent and placed in receivership.

1. European-American Bank & Trust Company ("EAB"), as successful bidder, agreed pursuant to a "Purchase and Assumption Agreement" to purchase $1.54 billion of FNB assets from FDIC as Receiver including the 104 branch offices of FNB, and to pay a $125 million premium therefor. The banking offices would thereby be enabled to open the next day for business without interruption. EAB assumed $750 million of insured deposits and over $900 million of uninsured deposits and other general liabilities. An express condition of this agreement was the release by FRB–NY of its lien upon the assets of FNB.

2. FDIC as Receiver, sold pursuant to an "Agreement of Sale," all of the remaining assets of FNB not acquired by EAB to FDIC (corporate) for liquidation thereof, the proceeds of those assets to be applied to pay the principal and interest due on the Indebtedness to FRB–NY, the costs of liquidation, any loss which FDIC might sustain on a Capital Note which FDIC (corporate) agreed to purchase from EAB to facilitate EAB's transaction with the Receiver, and a return of 6½% per annum on out-of-pocket funds advanced by FDIC (corporate) for the foregoing purposes. Any excess remaining from the liquidation after the proceeds were so applied was to be remitted to the Receiver as contingent additional consideration for the sale to FDIC (corporate) of the remaining assets.

3. FDIC (corporate) and FRB–NY entered into an "Agreement of Assumption of Indebtedness" by which FRB–NY agreed:

6. In keeping therewith, the surplus revenues of the Federal Reserve are turned over to the Treasury of the United States each year, after providing a fixed return of 6% to its stockholders.

(1) to forbear for a period of three years until the Final Payment Date from enforcing any of its rights relating to the Indebtedness;

(2) to modify the interest rate payable on the FRB Indebtedness by reducing the rate to 7.52% simple interest per annum on the unpaid principal amount thereof, payable on the Final Payment Date, less an "adjustment" of up to $15 million for expenses in liquidating the remaining assets, and by the payment to FRB–NY of an additional amount of interest in the contingency that the liquidation should provide funds therefor, to increase the amount of the total interest to a rate of 8½% compounded annually over the three year forbearance. The contingent obligation was not to bear interest for non-payment thereof at the Final Payment Date.

(3) to release its lien on and security interest in such collateral as was purchased by EAB from FDIC as Receiver pursuant to the contemporaneously executed Purchase and Assumption Agreement with EAB;

(4) to release its lien and security interest in the remaining collateral as it was transferred or liquidated by FDIC against payment of the proceeds in reduction of the Indebtedness and payment of the obligations assumed by FDIC absolutely or contingently; and

(5) to release the Receiver unconditionally from its primary liability with respect to the Indebtedness, and to hold it only secondarily liable if FDIC (corporate) did not pay the same.

FDIC (corporate) agreed:

(a) to liquidate the remaining assets of FNB as agent for the FRB and to remit the proceeds to FRB–NY in payment on account of the principal of the Indebtedness;

(b) to assume the Indebtedness as primary obligor and to pay on October 7, 1977 (the Final Payment Date) any balance of the Indebtedness then outstanding together with simple interest over the three-year period calculated at the rate of 7.52% per annum on the principal amounts outstanding less the actual out-of-pocket expenses of FDIC incurred in liquidating the remaining assets but not to exceed $15. million.

(c) to pay to FRB–NY, if the proceeds from liquidation of the remaining assets exceeded the sum of the Indebtedness, the interest mentioned above in subdivision "(b)" and the costs of liquidation, as additional interest an amount computed on the outstanding Indebtedness at the rate of 8.5% per annum (compounded annually) less the interest computed at the fixed rate of 7.52%.

Over the period of the forbearance, FNB's former assets were liquidated and payments on account of the principal of the Indebtedness were made to FRB–NY. At the date of maturity of the loan, October 7, 1977, FDIC (corporate) paid over $607 million to FRB–NY from its insurance trust funds to satisfy the remainder of the Indebtedness with interest at the fixed rate of 7.52%. Some $200. million of the sum so advanced by FDIC plus interest remains presently unpaid. The liquidation of the remaining assets has been continuing; self-evidently no payment of the contingent interest agreed upon has as yet been made to FRB–NY.

The Agreement of Assumption of Indebtedness between FRB–NY and FDIC (corporate) was approved by the Board of Governors of the Federal Reserve System. In addition, the sales of the assets to EAB and of the remaining assets to the FDIC, by the Receiver, as well as the sale of the FNB trust business to Bradford Trust Company were presented in a petition for approval as required by 12 U.S.C. § 192 in an ex parte proceeding to the United States District Court for the Eastern District of New York and were approved on October 8, 1974 by the late Judge Orrin Judd who authorized and directed FDIC as Receiver to execute all documents necessary or convenient to carry out their terms and provisions.

III.

As already indicated the Receiver sold the remainder of FNB's assets to FDIC (corpo-

rate) on its agreement to liquidate those assets and to satisfy therefrom the principal liabilities of FNB. The price to be paid was the assumption by FDIC (corporate) of FNB's liabilities to FRB–NY and the purchase by FDIC (corporate) of a Capital Note from EAB. As additional contingent compensation FDIC (corporate) agreed to turn over to the Receiver any proceeds of the liquidation remaining after satisfying the obligations described in the Agreement of Sale. Thus, the Receiver had a contingent interest in the scope of the obligations that FDIC (corporate) assumed—the greater these were, the smaller would be the chance of additional compensation to the receivership estate for the sale.

FDIC had insured FNB's deposits. It had a corporate and governmental interest in seeing to it that the depositors' claims were satisfied at the minimum cost to its insurance trust funds. The opportunity to be relieved of paying depositors was presented in a sale of those liabilities to EAB. As release of the lien of the Reserve Bank was prerequisite to a sale to EAB, FDIC (corporate) had an impetus to pay whatever terms were demanded by FRB–NY for the forbearance, while as Receiver its interest was to effect the Reserve Bank's forbearance at the cheapest rate of interest obtainable.

It is because of the conflicting interests so faced that plaintiff attacks the monetary interest terms of the assumption agreement as excessive and otherwise improper.

The sale to FDIC (corporate) by the Receiver was authorized by federal statute. 12 U.S.C. § 1823. On the basis of the statute defendants argue that a Court may not reach into the transactions to reduce the interest aspect of the forbearance assumed by FDIC (corporate). However, the Court has heretofore held that the fairness of the transactions made by the Receiver, of which the interest arrangement is only a part is nonetheless reviewable because of the dual interests which FDIC served, as Receiver of the insolvent estate and corporate-wise as insurer of the bank's deposits.

## IV.

Interest is the price of the use of money loaned or of forbearance, according to a fixed ratio. The forbearance agreed to by FRB–NY with FDIC in 1974 was *sui generis*—no such forbearance or any loan of a similar size had been effected previously in economic history. Perforce there is neither a standard or going rate available for direct comparison with the interest rate challenged here. Plaintiff contends that FRB–NY was entitled only to post-insolvency simple interest up to October 7, 1977 at a lower rate than agreed upon and only to the extent payment of such interest would achieve a balance of equities among creditors of FNB, and between creditors of FNB and the FNB receivership estate. Plaintiff is content to accept the benefit of the purchase and assumption transaction. He attacks only the consideration due the Reserve Bank for its release of its rights as a secured creditor and its three year forbearance and the release of its liens which made the transaction possible.

The rate of interest on the forbearance was a major subject of discussion and negotiation for several weeks and remained fluid right up to the moment of the final form of the agreements. Drafts and counterdrafts were exchanged in the negotiation and objections were voiced on each side resulting in changes and modifications as the drafts continued to flow. Richard A. Debs then Vice-President and Chief Administrative Officer of FRB–NY and now with Morgan, Stanley & Company, gave the following testimony:

> This was a unique loan. But basically, we looked to the market rates prevailing at that time . . . there was a lot of discussion about what a fair rate should be for the Franklin loan . . . this was going to run out to several years. . . . They [FDIC] were negotiating rather hard, as they should have, in terms of their own interest and their own funds and so forth to keep the rate as low as possible from their point of view.
>
> We, on the other hand, had an obligation as Federal Reserve officers with public

assets involved and basically ultimately taxpayers money involved, to make sure that we were not in any way giving away taxpayers money.

And the benchmarks we looked to were market rates.

\* \* \* \* \* \*

[O]ur ultimate aim in this specific transaction was to aim at a rate that was a defensible, appropriate rate in terms of all the benchmarks we had to look to. We did not have a duty in any way to insure that the shareholders of Franklin received any benefits.

Initially, FDIC was thinking of an interest rate consistent with its own portfolio rate of about 6¼% which was lower than the open market rate, albeit the new money at FDIC was being invested at current market rates in the high 7 percents and about equal to or in excess of the open market rate which was a floating rate on a day to day basis and not a specified figure.

Factored into the rate question was the fact that FRB–NY was not going to receive its money immediately.

Whether the rate was to be a floating one or a fixed rate was very much a topic of the negotiations. There was no consensus as to the level to which the rates of interest would decline or the length of time during which they would remain at a lower level. Many economists and analysts believed that long term rates would remain high as long as inflation remained above 5%. The future course of long-term interest rates was highly unpredictable. It was foreseen that interest rates could fluctuate rather widely during the projected three to five year repayment period. The ultimate consensus of the FDIC staff was to attempt to reach agreement on a fixed rate rather than a floating rate.

Interest rates in the money markets rose steadily during the first eight months of 1974, reaching historic high levels for both long and short-term obligations in August. In the latter part of August rates began to sag. The discussions which led to the transactions of October 8, 1974 took place between July and October. There was a wide difference of opinion on the future course of the economy, inflation, recession, the securities markets and the money markets. Many economists and analysts expected further declines in interest rates. On the other hand, there were those who were reasonably skeptical and believed that much uncertainty lay ahead and that while yields were expected to fall irregularly the decline would be moderate going into 1975. The roller coaster of interest rates depended on many imponderables and forecasts gave no assurance that for the long term the economy was not facing another round of double digit rates of interest as well as of inflation. A floating rate could as well float upward. as downward over a period of years and there was no predictable mean on which to rely.[7]

The key United States money market interest rates included the following short and long term rates or yields:

Federal Reserve Federal Funds rate: The interest rate on loans of Reserve Bank funds traded among commercial banks for overnight use in amounts of $1 million or more.

Discount rate: The interest charge by the Reserve Bank on short term loans to member commercial banks.

System Open Market Account rate: The average interest return on the FRB–NY portfolio of government and agency securities (referred to hereafter as the "SOMA" rate).

Prime rate: The interest charge by large United States money center commercial banks to their best business borrowers.

During the period of the negotiations these interest rates were approximately as follows: [8]

---

7. The current period bears a striking parallel to the 1974 money market picture, even to the months of the year in which the changes were occurring.

8. The stated rates are all based on payment of interest more frequently than annually. Their compound annual equivalents are higher if to be compared with the 8½% compounded annually in the Assumption Agreement.

| Rate (%) | May | June | July | August | Sept. | Oct. 8 |
|---|---|---|---|---|---|---|
| Federal Funds [9] | 11.29 | 11.45 | 12.60 | 11.84 | 11.12 | 11.04 |
| Discount on "eligible" collateral | 8. | 8. | 8. | 8. | 10.[10] | 10. |
| Discount on "satisfactory" collateral | 8–½–9 | 8–½–9 | 8–½–9 | 8–½–9 | 10.[10] | 10. |
| SOMA | 7.06 | 7.19 | 7.22 | 7.23 | 7.61 | 7.52 |
| Prime | 11.50 | 11.75 | 12.00 | — | — | 11.75 |
| 3–5 Yr. U. S. Treasury issues | | | | 8.55 | 8.61 | 8.07 |
| 3 Yr. U. S. Agency Bds. | 8.30 | 8.29 | 8.69 | 9.05 | 9.36 | 8.49 |

The interest aspect of the October 8, 1974 transactions jelled at agreement to modify the latest prevailing FNB contract rate of 10% to the SOMA rate (7.52%) as the fixed interest less $15,000,000 liquidation expenses, such interest to be paid at maturity [11] rather than currently; and when and if the proceeds of liquidation ultimately permitted, to pay therefrom the $15 million expenses and an additional amount to bring the fixed interest up to the area of the original FNB contract rate, i. e., an amount arrived at by accruing interest at the annually compounded rate of 8.5% over three years less the amount of the fixed interest paid at 7.52%.

The contingent addition to the interest obligation was designed to recoup the difference between the SOMA rate being discussed (approximately 7.5%) and the one-day note rates existing and payable by FNB in August 1974 (8% if loan was secured by "eligible" and 8½% if secured by "satisfactory" collateral). This was referred to variously as the "interest rate differential" or as a "recoupment" provision. In the course of the continuing negotiation of terms on September 9 FRB–NY inserted the compounding feature for the calculation of the contingent recoupment in its draft of agreement submitted to FDIC. On September 10, 1974 FDIC's representatives agreed with the principle that FRB–NY should recoup the difference between the interest rate paid by FDIC and the rate previously paid by FNB before payments to creditors or shareholders of FNB, but the rate of interest to be used in determining the amount of such recoupment continued to be a subject of intense bargaining and compromises up through at least September 26. There seems to have been some discussion of FRB–NY wanting the 10 percent rate which became effective on September 27. Ultimately the 8½% rate calculated as proposed on September 9 for the additional interest was the rate agreed upon as approximating a market rate, the additional amount to be entirely contingent upon actual collections from the assets of FNB.

The effective annual yield of the fixed portion of interest under the Agreement of Assumption of Indebtedness at 7.52% nomi-

**9.** Federal Funds rate peaked in July 1974 at 13.55%, went down for a year, levelled off and started an upward climb in July 1977. By the end of June 1978 the rate was 7.53% and climbed steadily thereafter. At the end of December 1978 Federal Funds were again traded at a double digit interest rate. Currently, Prime and Discount rates are also in double digit percents.

**10.** On September 27, 1974 FRB–NY established a discount rate of 10 percent per annum on advances to member banks for prolonged periods and in significant amounts. *See* text at note 5.

**11.** It was estimated in 1974 that this deferral of payment of interest until the end of three years would benefit the receivership estate by approximately $26 million. The actual benefit has been $35 million.

nally was 6.485% and assuming as the parties seem to do that it takes another six years to liquidate assets sufficient to cover the contingent aspect of the interest, the effective yield to FRB–NY on the total of · the interest obligation payable to it is 7.65% if paid in 1985, 7.74% if paid in 1984, 7.83% if paid in 1983, 7.92% if paid in 1982 and 8.03% if paid in 1981. Meanwhile, the FNB receivership estate has obtained as benefits of the arrangement the $125 million premium from EAB on the assets sold to it, a sale made possible by lifting of FRB's security interest in those assets and to date another $341 million in income on collateral released by FRB–NY.

## V.

It is conceded by the plaintiff that FRB–NY is entitled to be fairly compensated for the use of its money represented by the Indebtedness; that the appropriateness or fairness of the interest rates which FNB's estate might ultimately bear for the three year accommodation, must be determined in light of the circumstances existing and reasonably to be perceived *at the time* that the Assumption Agreement was made. No charge is made there of any bad faith or fraud on anyone's part in the negotiations or Agreements.

The question in this case as indicated is whether FDIC improperly burdened the potential results of the asset liquidation and thereby reduced the contingent additional consideration for the sale of the assets to FDIC (corporate).

At the threshold it must be observed that FNB or FDIC as Receiver of FNB, could not have borrowed the $1.7 billion necessary to repay the Indebtedness in the market on October 8, 1974 at any rate of interest. Loans made by the Federal Reserve are made for a public purpose, they are not intended to serve private interests; its loans are made only to banks; it is not in commercial business. Thus, setting of its rates of interest in transactions of the sort here involved is really a political or philosophical problem and not a financial problem. To have allowed FNB to go to immediate liquidation would have had tremendous repercussions; the entire banking system might have been destroyed.

The circumstances existing in which the rescue effort occurred included the onset of an economic recession, political trouble at home, an important bank failure abroad, energy dislocations and the oil crisis from the quadrupling of oil prices and a generally unprecedented economic situation. The plan of the Receiver to arrange a forbearance by FRB–NY was an attempt to create as few waves as possible in the financial market and in a very difficult situation.

There was a paramount public interest here to be served; but this is not basis for an obligatory subsidy by the Federal Reserve to augment FNB's estate for the benefit of the subordinated debenture holders and stockholders of FNB.

Reserve Banks are operated for public service. The member banks as stockholders do not have or expect the attributes of control or financial interest ordinarily attached to stock ownership in corporations that are operated for profit. In case of the liquidation of any Reserve Bank, its surplus would be paid entirely to the United States. Its surplus income belongs to the United States and goes into the Treasury annually. Any lowering of interest charges for advances to a member bank or for its benefit is directly made at the expense of the general taxpayer.

The Federal Reserve Act was enacted to give the country an elastic currency, to provide facilities for discounting commercial paper and to improve supervision of banking. Its purposes do not include overriding of the public's interest by preferred or special or concerned treatment of holders of subordinated debentures and stock of insolvent banks. It has no obligation at the expense of the general taxpayer to subsidize money lenders to banks which become insolvent or their stock investors, or to supply term loans at below-market or noncommercial rates of interest, directly or indirectly or for the benefit of FDIC as Receiver of insolvent banks. Nor is it obliged to discount commercial paper at rates more favorable after insolvency than before in-

solvency of a member bank. It is the public interest that the Federal Reserve Bank must serve.

The primary purpose of FDIC is to insure the deposits of all banks entitled to insurance benefits under the Federal Deposit Insurance Act; to pay off depositors of insured banks; to act as receiver for all national banks placed in receivership and to prevent the continuance or development of unsafe and unsound banking practices.

FDIC is not obligated even if named as Receiver to apply its trust fund for the benefit of the interests of subordinate debenture and stock holders of insolvent banks or to furnish subsidies for them.

As receiver, FDIC is obliged to take custody and to marshal the assets and liquidate the affairs of an insolvent bank.

The notion that is unspoken here by plaintiff and the intervenors that FDIC was in some way obligated to supply its trust funds at interest rates lower than available from FRB–NY to ease or accomplish the liquidation of the FNB receivership estate, has no basis in fact or in law. Thus to suggest as an alternative that FDIC should have used $2 billion of its own money to mitigate the rate of interest charged by FRB–NY is a groundless suggestion. No receiver is bound to use its own funds to enhance a receivership estate. There was no financing other than the forbearance of FRB–NY which was reasonably available for the orderly liquidation of the receivership estate.

During 1974 FDIC invested its new funds at an average rate of 8.05% per annum albeit the average return on the Corporation's portfolio of government securities was 6½% because many old loans were contained therein. Consequently as an aside, it appears that it could make no difference to the receivership estate whether the $1.723 billion was borrowed in effect from FRB–NY at an effective yield from 7.65% to 8.03% (depending upon when the contingent interest is completely paid), or loaned on the same conditions by FDIC at the same rates from its trust funds held for assurance of depositors' balances, as suggested by plaintiff.

The give and take of the negotiation of the Agreement of Assumption of Indebtedness in which the final provisions for fixed and contingent interest became an integral part included many permutations and combinations and compromises of a variety of complex matters. The choice made by the Receiver not to risk the rollercoaster of Reserve Bank discount rates, in a nervous economy, cannot be faulted as a breach of fiduciary duty of the Receiver by a hindsight wisdom developed after the storm had spent itself, long after the deal closed. The shelter of a fixed rate was a rational choice that the Receiver was privileged to make in administering the interests of the Estate. In 1974, a respectable body of opinion was against gambling on the future cost of money. The agreements were neither arbitrary nor capricious.

With the benefit of hindsight, plaintiff's experts freely opined that prudence dictated that the Receiver and FDIC should have obtained a floating rather than a fixed rate of interest obligation for the three-year forbearance by FRB–NY. Those experts conceded that a floating rate presented a risk. A floating rate can float up as well as down; but plaintiff's expert found solace for this in the opinion that "if you were wrong under those circumstances you would be wrong in awfully good company." The same expert put his finger on an important consideration of the hindsight appraisals the Court received when he said: "You can't really sit back and do a laboratory study of this kind for those circumstances and say one's right and one's wrong."

The law provides that the Government is entitled to be adequately compensated for the use of its money. *See United States v. Ring Construction Co.,* 113 F.Supp. 217 (D.Minn.1953); *United States v. Hopkins,* 95 F.Supp. 14 (N.D.Ohio 1951); *United States v. American Metal Co.,* 86 F.Supp. 533 (D.N.J.1949). In determining the fairness of interest rates, courts have looked to the rates set by contract between the parties, prevailing market rates and legal lending rates. *See Mid-Jersey National Bank v.*

*Fidelity-Mortgage Investors,* 518 F.2d 640 (3d Cir. 1975); *In re Hartsdale Associates,* 452 F.Supp. 67 (S.D.N.Y.1978); *Walter E. Heller & Co. v. Cox,* 343 F.Supp. 519 (S.D.N. Y.1972), *aff'd mem. sub nom. Walter E. Heller & Co. v. Ocean Air Tradeways,* 486 F.2d 1398 (2d Cir.), *cert. denied,* 414 U.S. 827, 94 S.Ct. 46, 38 L.Ed.2d 61 (1973).

In light of these criteria, the interest rate charged by FRB–NY was more than fair to the receivership estate. The rate provided in the Assumption Agreement, even if the contingent amount is fully paid, afforded a yield below the relevant market rates, the contract rates of the FNB notes (8½%, later 10%), and the legal lending rate set by the New York Banking Board under N.Y.Gen. Oblig.Law § 5–501(1) (8½%). Under all the facts and circumstances, plaintiff's claim that the FRB–NY rate was unfair falls to the ground. The plaintiff has failed to sustain a claim of unfairness with credible evidence.

Were New York law applicable to the choice of an appropriate rate, the FRB–NY would be entitled to post-insolvency interest at the legal, contract or market rate, and would not be limited to interest at the judgment rate. The Reserve Bank would have been entitled to foreclose on its security in an equitable proceeding under state law and the court would not be bound to apply the judgment rate but could in conformity with principles of equity award interest at higher market or contract rates. *See* N.Y. C.P.L.R. § 5001(a).

## VI.

The dual role of the FDIC in the transaction with FRB–NY was authorized by congressional mandate. 12 U.S.C. § 1823(e) (1976). Congress provided in that statute that "the Corporation [FDIC] may purchase any such assets" of a closed insured bank and that "the Corporation as receiver [of an insured bank] is authorized to contract for such sales." This statutory authority disposes of plaintiff's contentions under the rule against divided loyalty, *see, e. g., Meinhard v. Salmon,* 249 N.Y. 458, 464, 164 N.E. 545 (1928). The FDIC did not place itself in

irreconcilable conflict with the receivership estate by entering into a transaction expressly authorized by statute.

The contract to be reviewed involves two federal agencies acting pursuant to the comprehensive scheme for the regulation of National Banks and of our nation's monetary system. The rules of decision are to be sought first in the National Bank Act, 12 U.S.C. §§ 191–200, the Federal Deposit Insurance Act, 12 U.S.C. §§ 1811–1832, and in the case law thereunder. *See United States v. Kimbell Foods, Inc.,* 440 U.S. 715, 99 S.Ct. 1448, 59 L.Ed.2d 711 (1979); *D'Oench Duhme & Co. v. F.D.I.C.,* 315 U.S. 447, 62 S.Ct. 676, 86 L.Ed. 956 (1942). If federal law is silent in a particular circumstance, state law may be selected as the applicable federal rule where it would provide a rule of general applicability which would not frustrate a federal policy or program. *See United States v. Little Lake Misere Land Co.,* 412 U.S. 580, 93 S.Ct. 2389, 37 L.Ed.2d 187 (1973); *Clearfield Trust Co. v. United States,* 318 U.S. 363, 63 S.Ct. 573, 87 L.Ed. 838 (1943).

Under the law of National Bank receiverships, a secured creditor of a National Bank is entitled to the interest on the principal obligation owing to it to the extent that its security is sufficient to cover both principal and interest, notwithstanding the insolvency of the Bank or the appointment of a Receiver for it. *See Ticonic National Bank v. Sprague,* 303 U.S. 406, 412–13, 58 S.Ct. 612, 82 L.Ed. 926 (1938). Any contrary doctrine to be found in cases arising under the Bankruptcy Act is irrelevant, as that Act expressly exempts National Banks from its bankruptcy and reorganization provisions. 11 U.S.C. §§ 22, 506 (1976); 11 U.S. C.A. § 109(b) (1979) (effective October 1, 1979); *see* S.Rep. No. 95–989, 95th Cong., 2d Sess. 31 (1978), *reprinted in* [1978] *U.S.Code Cong. & Admin.News,* p. 5787.

Plaintiff's challenge to the contingent portion of the interest agreement as a form of illegal compounding of interest also lacks substance. The formula agreed upon to arrive at the "interest rate differential" or "recoupment provision" is not a provision

for compound interest within the proper definition of the term. That the agreement used the words "compounded annually" to calculate the amount of a differential to be paid as interest is not determinative. Other features of the recoupment provision—the fact that the total amount due was to be fixed only after three years, that no further interest accumulated on the differential although the date of payment thereof was and remains today in the uncertain and distant future—remove it wholly from the ambit of agreements to compound interest on interest which have been disfavored by some courts.

Even if the recoupment provision were to be deemed an agreement to pay compound interest, there is no general federal policy or rule of law against an agreement to pay compound interest on obligations incurred by National Banks or their receivers with a Federal Reserve Bank. In particular, the case relied on by plaintiff, *Vanston Bondholders Protective Committee v. Green,* 329 U.S. 156, 67 S.Ct. 237, 91 L.Ed. 162 (1946), does not establish any rule applicable herein. *Vanston*'s disapproval in a reorganization proceeding of a pre-insolvency agreement to pay interest on unpaid interest is of no relevance to the instant review of the post-insolvency agreement made by the Receiver in the course of its obligations under the federal banking laws to wind up the affairs of an insolvent National Bank. At most, the equitable principles invoked in *Vanston* merely sanction the review of the agreement which has been conducted herein; they do not condemn compound interest in all circumstances and do not preclude this Court's finding that the agreement was fair and appropriate.

This Court also declines to invoke as the rule of decision herein the New York common law rule against interest on interest. That rule appears to be aberrant among the laws of the fifty states, *see* 6A A. Corbin, *Contracts* § 1508, at 702–03 & n. 30 (1962), is subject to an exception for agreements between merchants, *Young v. Hill,* 67 N.Y. 162, 171 (1876), and arose from concerns of public policy inapplicable to an agreement between two federal agencies, *see Giventer*

*v. Arnow,* 37 N.Y.2d 305, 308, 372 N.Y.S.2d 63, 333 N.E.2d 366 (1975). Accordingly, the agreement to pay the contingent amount of interest to FRB–NY is not void as an illegal agreement under New York law.

## VII.

Upon consideration of all of the evidence and resolving the issues of credibility and in the light of the unprecedented circumstances prevailing at the time I find and conclude that it has been credibly established that all aspects of the October 8, 1974 transactions were legal and well within the range of reason and constituted the best results available on an overall basis. The Receiver did not profit at the expense of the Estate, it exercised sufficiently informed reasonable business judgment and the challenged aspects of the transactions were fair and not a breach of its fiduciary duty to the creditors and stockholders of Franklin National Bank.

## VIII.

The foregoing shall constitute the findings of fact and conclusions of law required by Rule 52(a) of the Federal Rules of Civil Procedure.

The complaint is accordingly dismissed, with costs and judgment shall be entered herein in favor of the defendants against the plaintiff and the plaintiffs-intervenors.

SO ORDERED.